**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-00169-NYW

CHARLES A. PURDY, JR.,

     Plaintiff,

v.

NANCY A. BERRYHILL,[1]

     Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

     This civil action arises under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401–33 and 1381–83(c) for review of the Commissioner of Social Security's final decision denying Plaintiff Charles A. Purdy's ("Plaintiff" or "Mr. Purdy") application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Pursuant to the Order of Reference dated June 8, 2016 [#20],[2] this civil action was referred to this Magistrate Judge for a decision on the merits.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2.  After carefully considering Plaintiff's Opening Brief [#16] and

---

[1]  This action was originally filed against Carolyn Colvin, as Commissioner of the Social Security Administration.  Commissioner Berryhill succeeded Commissioner Colvin as Acting Commissioner of the Social Security Administration on January 23, 2017.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, this court automatically substitutes Acting Commissioner Berryhill as Defendant in this matter.

[2]  For consistency and ease of reference, this Order utilizes the docket number assigned by the Electronic Court Filing ("ECF") system for its citations to the court file, using the convention [#___].  For the Administrative Record, the court refers to ECF docket number, but the page number associated with the Record, which is found in the bottom right-hand corner of the page.  For documents outside of the Administrative Record, the court refers to the ECF docket number and the page number assigned in the top header by the ECF system.

Defendant's Response Brief [#17], the entire case file, the Administrative Record, and the applicable case law, this court respectfully AFFIRMS the Commissioner's decision.

## PROCEDURAL HISTORY

This case arises from Plaintiff's second application for DIB protectively filed on or about June 21, 2011[3] [#11-5 at 165; #11-6 at 198; #11-8 at 373], and SSI filed on June 28, 2011 [#11-5 at 174]. Mr. Purdy completed eleventh grade at Catalina High School in Tuscon, Arizona where he took special education classes in several subjects, and he does not have his General Education Diploma ("GED"). *See* [#11-6 at 203; #11-7 at 285; #11-8 at 403]. Plaintiff alleges that he became disabled on April 9, 2011,[4] due to Morton's Neuroma in both of his feet, later diagnosed as diabetic peripheral neuropathy ("diabetic neuropathy"), and because he could not read or write well. *See* [#11-5 at 165, 174; #11-6 at 202, 229; #11-8 at 404]. Mr. Purdy was forty-three at the date of onset of his claimed disability.

The Colorado Department of Human Services denied Plaintiff's second application administratively on September 23, 2011. *See* [#11-3 at 112; #11-4 at 114, 117; #11-8 at 373].[5] Mr. Purdy timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on October 7, 2011. *See* [#11-4 at 120]. ALJ Paul R. Armstrong ("ALJ Armstrong") held a video hearing on September 28, 2012. [#11-8 at 373; #11-9 at 444]. At the hearing, Mr. Purdy

---

[3] The Application Summary for Disability Insurance Benefits lists a date of June 22, 2011, instead of June 21, 2011 [#11-5 at 165], but the date of application used by the ALJ in the operative decision is June 21, 2011 [#11-8 at 373].

[4] Plaintiff's alleged onset date is two days after Administrative Law Judge Ronald L. Burton issued a decision finding Mr. Purdy not disabled regarding Plaintiff's first application for DIB and SSI—a decision Mr. Purdy did not appeal. *See* [#11-3; 11-8 at 373 & n.1].

[5] On April 17, 2014, Plaintiff filed a third application for DIB and SSI [#11-11 at 570, 577], applications the Colorado Department of Human Services denied administratively, *see* [#11-8 at 374 n.3]. Although not at issue in this appeal, ALJ Kathryn D. Burgchardt did consider materials relating to this third application when reaching her decision as to Plaintiff's second DIB and SSI application—the application relevant to this appeal.

proceeded through counsel, and ALJ Armstrong received testimony from Plaintiff, Melissa Brassfield (a Vocational Expert), and Rhonda Blackmore (Mr. Purdy's significant-other). *See* [#11-8 at 373; #11-9 at 444]. On October 22, 2012, ALJ Armstrong issued a decision finding Mr. Purdy not disabled under the Act. [#11-9 at 455]. Plaintiff requested Appeals Council review of ALJ Armstrong's decision, which the Appeals Council denied, rendering ALJ Armstrong's decision the final decision of the Commissioner of the Social Security ("Defendant" or "Commissioner"). [*Id.* at 460].

Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on May 21, 2014. [*Id.* at 465]. Before a decision on the merits, however, the court granted Defendant's Unopposed Motion to Remand for Further Proceedings, remanding this matter back to an ALJ. *See* [*id.* at 467]. On remand, the Appeals Council vacated the Commissioner's final decision and directed an ALJ to supplement the evidentiary record, and reconsider Plaintiff's maximum residual functional capacity ("RFC"), Plaintiff's subjective complaints of the severity of his symptoms, and whether jobs exist in significant numbers in the national economy that Plaintiff can perform given his treating physician's opinion that Plaintiff must elevate his legs during the workday. *See* [*id.* at 478].

Upon reassignment of Plaintiff's case, ALJ Kathryn D. Burgchardt (the "ALJ") held a second hearing on September 16, 2015. *See* [#11-8 at 375, 399]. Ginger L. Ryan, a non-attorney, represented Mr. Purdy at this hearing, where the ALJ received testimony from Mr. Purdy and Ronald J. Brennan, a Vocational Expert ("VE"). *See* [*id.* at 375]. At his second hearing, Mr. Purdy testified that he had not worked since his alleged onset date of April 9, 2011. [*Id.* at 403]. When asked why, Plaintiff responded, "they said it was a layoff, but I was starting to have a lot of problems with my feet and missing days." [*Id.*]. Plaintiff continued that his

diabetic neuropathy was becoming progressively more severe, prohibiting him from securing other employment and, thus, being the reason for his DIB and SSI applications. [*Id.* at 403–04]. Specifically, Plaintiff testified that he initially began experiencing numbness in his toes, a sharp pain occurring approximately four to five times a day, followed by weeks of complete numbness in his feet, and ultimately that the numbness is constant in the ball of his feet, his toes, and up to his left knee and approaching his right knee. [*Id.* at 420–22].

Plaintiff also testified that his worsening diabetic neuropathy has made it difficult to care for and play with his five-year old daughter, although he still does puzzles, plays with blocks, and takes his daughter to the park on occasion. [*Id.* at 409–10, 413, 415]. In addition, his diabetic neuropathy has made it difficult for him to drive because he fears slamming the brakes. [*Id.* at 411]. When asked about his hobbies, Plaintiff testified that he enjoyed going dirt biking and fishing; however, it had become "extremely difficult for [him] to do [either] anymore," given his diabetic neuropathy. [*Id.* at 412]. Now, he sometimes sits in a dark room by himself, rests in his recliner chair to ease the pain in his feet, rarely exercises, and rarely goes out to the movies or to dinner. *See* [*id.* at 413–14]. Similarly, Plaintiff testified that his significant-other and her nineteen-year old son do most, if not all, of the household chores; however, he does do some simple cooking, but not as much as he used to. *See* [*id.* at 418–20].

Plaintiff then testified that his diabetic neuropathy was spreading to his hands. [*Id.* at 422]. Because of this, Plaintiff indicated that he was "working on trying to get back to the neurologist to find out how significant it might be . . . in [his] hands." [*Id.*]. When asked how this affected his self-care, Mr. Purdy responded that he no longer shaves because he cut himself the last time he tried. [*Id.* at 423, 429]. Plaintiff continued that he also tried to help a friend change the brakes on a car, but he could not use the wrenches for more than fifteen to twenty

minutes before dropping them.  [*Id.* at 429].  Plaintiff testified that he "can[not] seem to hold on to things," that he is dropping things frequently, and that this is hindering his ability to find another job.  [*Id.* at 432–33].

Ronald J. Brennan, a VE, also testified at the hearing.  The VE testified that Plaintiff's past work included a mechanic helper, a specific vocational preparation ("SVP")[6] level 3 heavy exertion job; a cook, SVP level 7 medium exertion job; an attendant, lodging facility, a SVP level 3 medium exertion job; and an oven tender, SVP level 4 medium exertion job.  *See* [*id.* at 433–34].  Based on Plaintiff's ailments, the VE testified that Plaintiff could not return to work at any of his previous jobs.  *See* [*id.* at 435–38].  Accordingly, the ALJ posited three hypothetical questions to the VE to determine whether jobs existed in the national economy that Plaintiff could perform.

First, the ALJ asked the VE to consider the employment opportunities for an individual with the same age, education, and past work experience as Mr. Purdy, who required unskilled SVP level 1 or 2 jobs, and had the following restrictions:  (1) could lift or carry only up to ten pounds frequently and 20 pounds occasionally; (2) could stand or walk with normal breaks for only two hours in an eight-hour workday and who used a cane to ambulate; (3) could sit with normal breaks for only six hours in an eight-hour workday; (4) could push and pull with both upper and lower extremities within the weight restrictions given; (5) could climb only stairs and

---

[6] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003). SVP level 3-4 is associated with semi-skilled work. https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html.

ramps occasionally; (6) could perform only basic reading and math; and (7) could not perform commercial driving.  [*Id.* at 434–35].  In response, the VE testified that three sedentary jobs existed that such an individual could perform.  [*Id.* at 435].  These included a food clerk orderer, SVP level 2; a charge account clerk, SVP level 2; and a production helper/utility worker, SVP level 2—all of which existed in significant numbers in Colorado as well as nationally.  [*Id.*].

Second, the ALJ inquired about an individual with the same restrictions as hypothetical one; however, this individual's ability to perform fine manipulation with his hands was limited to "only frequent," with no limitations on bilateral manual dexterity for gross manipulation.  *See* [*id.* at 436].  The VE testified that a person with this limitation could not perform the job of a food clerk orderer, as such a job required constant fine manipulation.  [*Id.* at 437].  However, such an individual could perform the jobs of charge account clerk and production helper/utility worker, because both required only frequent fine manipulation.  [*Id.*].

Third, the ALJ further limited the hypothetical to an individual with the same restrictions as hypotheticals one and two; however, this individual would miss at least three days a month due to a combination of impairments.  [*Id.* at 438].  In response, the VE testified that such an individual could not perform any work that existed in the national economy.  [*Id.*].  The VE continued that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion publications.  [*Id.*].

Plaintiff's representative, Ms. Ryan, also posed an additional hypothetical to the VE.  She asked whether an individual with the restrictions identified in hypothetical two who also had to elevate his legs to thigh and/or waist height for eighty-percent of the day could perform the jobs of charge account clerk or production helper/utility worker.  [*Id.*].  The VE responded, "No. No."  [*Id.*].

Following the hearing, and upon reconsideration of the record and supplemental evidence, the ALJ issued a written decision finding Plaintiff not disabled on November 13, 2015. [#11-8 at 371-390].   The ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform, despite several severe impairments.  [*Id.* at 377, 388].   Thus, the ALJ concluded that Plaintiff was not disabled as defined under the Act.  [*Id.* at 389].

Mr. Purdy did not file any exceptions to the ALJ's decision; thus, the ALJ's order became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on January 22, 2016 [#1], invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).  On appeal, Mr. Purdy challenges the ALJ's failure to adequately consider the impairments in his upper extremities, allegedly caused by Lateral Epicondylitis ("Tennis Elbow") in his left elbow and the spreading of his diabetic neuropathy into his hands. *See* [#11-13 at 678–79, 702; #16 at 5].

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007)

(internal citation omitted).  Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency."  *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002).  *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted).  However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).  The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty,* 515 F.3d at 1070 (internal citation omitted).  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### I.     The ALJ's Decision

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).  Supplemental Security Income is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act.  42 U.S.C. § 1382.  An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002).  Additionally, the claimant must prove he was disabled prior to his date last insured.  *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.  20 C.F.R. § 404.1520(a)(4)(v).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.  Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*  Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 404.1520(e).  If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d 750.  Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d).  *Id.*  At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751.  The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th

Cir. 2015) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (internal quotation marks omitted)).  "The claimant bears the burden of proof through step four of the analysis." *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience.[7]  *Neilson*, 992 F.2d at 1120.  The Commissioner can meet his or her burden by the testimony of a vocational expert.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99, 1101 (9th Cir. 1999).

The ALJ found that Mr. Purdy was insured for DIB through December 31, 2014.  [#11-8 at 377].  Next, following the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 9, 2011.  [*Id.*].  At step two, the ALJ determined Mr. Purdy had the following severe impairments:  diabetes mellitus with associated peripheral neuropathy, obesity, borderline intellectual disorder, and an affective disorder.  [*Id.*].  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  [*Id.* at 380–82].  At step four, the ALJ found that Mr.

---

[7] "A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's 'RFC category,' the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work).  *Williams*, 844 F.2d at 751-52.  However, if a claimant suffers from both exertional and nonexertional limitations, the decision maker must also consider "all relevant facts to determine whether the claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations."  *Id.*

Purdy had the RFC "to perform unskilled work . . . in jobs requiring no more than basic reading and math skills, and jobs where he would not have to operate motor vehicles for commercial purposes" subject to additional limitations, [*id.* at 382], and that he was unable to perform any of his past relevant work, [*id.* at 387].   At step five, considering Mr. Purdy's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.   [*Id.* at 388–89].

Mr. Purdy challenges the ALJ's RFC determination and her conclusion at step five. Namely, that substantial evidence supports neither decision because the ALJ failed to properly consider Plaintiff's upper extremity impairments.   [#16].   Specifically, Plaintiff alleges that the ALJ's RFC determination is too vague, as the ALJ improperly evaluated the medical evidence and medical source opinions, as well as Plaintiff's subjectively reported limitations, and, because the ALJ's RFC determination is flawed, so too is her step five conclusion.   *See* [#16 at 8, 9, 12, 13].   The Commissioner responds that the ALJ's RFC determination is free from legal error and supported by substantial evidence, because the objective medical evidence does not support any greater limitations on the use of his upper extremities, and because the ALJ properly considered the medical source opinions and Plaintiff's daily activities.   [#17 at 6–7, 9].   The court considers the Parties' arguments in turn.

## II.   The RFC Assessment

In formulating a claimant's RFC, the ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [these] symptoms can reasonably be accepted as consistent with the objective medial evidence and other evidence."   20 C.F.R. § 404.1529(a). This requires the ALJ to consider medical signs and laboratory findings, statements by the claimant's treating or non-treating source(s), statements by the claimant, or any other statements

regarding a claimant's symptoms to determine whether a physical or mental impairment(s) could reasonably produce the claimant's symptoms. *See* 20 C.F.R. § 404.1529(a)-(c). Next, the ALJ must determine the extent to which the intensity, persistence, and limiting effects of the claimant's symptoms limit his functional abilities. *See id.*; *see also* Social Security Ruling ("SSR") 96-8p (explaining that an RFC assessment must discuss the claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.").

Here, Mr. Purdy contends that the ALJ's RFC assessment is "too vague to allow the court to determine whether [she] followed the appropriate legal principles." [#16 at 8]. Specifically, he contends that the ALJ failed to consider the medical evidence and source opinions regarding his upper extremity impairments, and that the ALJ improperly concluded that his subjective complaints regarding his upper extremity impairments were inconsistent with his daily activities. [*Id.* at 9, 12].[8]

### A.   The ALJ's RFC Decision

The ALJ began her analysis of Plaintiff's RFC by reviewing Mr. Purdy's alleged symptoms. *See* [#11-8 at 383]. First, the ALJ considered Plaintiff's June 29, 2011 Disability Report, wherein Plaintiff listed Morton's Neuroma, later diagnosed as diabetic neuropathy [#11-6 at 229], and his difficulties with reading and writing as his physical conditions that limited his ability to work. *See* [*id.* at 202; #11-8 at 383]. Next, the ALJ considered Mr. Purdy's July 12, 2011 Pain Questionnaire, wherein Plaintiff reported "sharp stabbing pain" in both of his feet that is "very severe and constant." [#11-6 at 208; #11-8 at 383]. In that same Pain

---

[8] Because Plaintiff's challenge to the ALJ's RFC assessment centers on his alleged upper extremity impairments, the following discussion of the RFC determination and medical evidence focuses specifically on these alleged impairments.

Questionnaire, Plaintiff reported that the pain prohibits him from being active, as he cannot stand or walk, and that the pain medications do not alleviate the stabbing, constant pain. [#11-6 at 208].

The ALJ then considered Mr. Purdy's July 18, 2011 Function Report, which again discussed his inability to stand or walk for more than twenty minutes due to the pain and swelling in his feet. [#11-6 at 221; #11-8 at 383]. This report also stated that Plaintiff's pain in his feet affects his ability to sleep and limited his ability to perform daily activities; however, Plaintiff indicated no issues with the use of his upper extremities. *See* [#11-6 at 222–27; #11-8 at 383].

Next, the ALJ considered Mr. Purdy's Pain Questionnaire and Function Report associated with his third application for DIB and SSI, filed April 17, 2014. [#11-8 at 383]. In his June 6, 2014 Pain Questionnaire, Plaintiff alleged that he experienced pain in his feet and hands, as well as in his back, hip, and elbow. *See* [#11-12 at 619]. In this Pain Questionnaire, Plaintiff also alleged that the pain lasts all day, and starts in his back and radiates into his hips and legs. [*Id.* at 619–20 (describing his pain as a tingling dull to a sharp pain)]. In his June 6, 2014 Function Report, Plaintiff alleged that he could be on his feet for only ten to fifteen minutes due to his diabetic neuropathy in his feet, and that his diabetic neuropathy had spread to his hands—the left being worse than the right. [*Id.* at 621; *see also id.* at 622 (explaining that he has a hard time shaving, because he drops things often)].

Lastly, the ALJ considered Plaintiff's September 30, 2014 Disability Report, wherein Plaintiff alleged to the worsening numbness in his feet and legs that caused Plaintiff to fall more frequently. *See* [#11-8 at 383; #11-12 at 639]. Ultimately, the ALJ concluded that Mr. Purdy's medically determinable impairments could reasonably be expected to cause the numbness in his

extremities and could reasonably be expected to interfere with his ability to lift heavy objects or to be on his feet for prolonged periods of time. *See* [#11-8 at 383–384]. However, the ALJ accorded Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms little weight, and determined that no impairment or combination thereof caused any work-related limitations over a continuous twelve-month period since April 9, 2011, that was not already identified in Plaintiff's RFC. [*Id.* at 384]; *see also* 20 C.F.R. § 404.1527 (explaining processes for evaluating opinion evidence).

The ALJ determined that the objective medical evidence did not "warrant the assignment of a more restrictive [RFC]," especially with regard to Plaintiff's upper and lower extremity impairments, and supported limiting Mr. Purdy to a "reduced range of unskilled, sedentary to light work." [*Id.* at 384]. In reaching this conclusion, the ALJ considered Plaintiff's daily activities. [*Id.* at 385]. Specifically, the ALJ noted that since Plaintiff's alleged onset date, he "has been able to carry out most activities of daily living . . . including taking care of his personal needs independently, caring for the needs of his minor daughter, cooking, performing light housework and yard work, managing money, and driving," as well as shopping and socializing. [*Id.*]. In addition, the ALJ placed significant weight on the objective evidence that, on numerous occasions, described Plaintiff as being "neurologically intact, and/or as having normal strength and sensation, and/or essentially normal strength and sensation, in his lower and upper extremities." [*Id.*]. In addition, the ALJ placed significant weight on the objective evidence that indicated that Plaintiff was not in any physical distress, and on the fact that nerve testing from October 15, 2012, indicated "very mild sensory neuropathy" in Plaintiff's left arm. [*Id.*].

Ultimately, the ALJ fashioned the following RFC:

With the exception of brief periods of less than 12 continuous months duration, the claimant has retained the residual functional capacity since the April 9, 2011

14

alleged onset date to perform unskilled work (that is work with specific vocational preparation profiles of 1 or 2) in jobs requiring no more than basic reading and math skills, and in jobs where he would not have to operate motor vehicles for commercial purposes subject to the following limitations/restrictions:  he can lift, carry, push and/or pull weights/forces of up to 10 pounds frequently and up to 20 pounds occasionally; and he can stand and/or walk with normal breaks for about two hours in an eight-hour period provided that he is allowed to use a cane; and he can sit with normal breaks for about six hours in an eight-hour period; and he can occasionally climb ramps and/or stairs but he cannot climb ladders, ropes or scaffolds.

[#11-8 at 382].

Plaintiff argues that "the ALJ found Mr. Purdy did not have the sustained RFC at all times during the period at issue to perform work with the RFC that the ALJ ultimately found . . . As it stands, the ALJ's RFC finding is too vague to allow the court to determine whether the ALJ followed the appropriate legal principles in finding that Mr. Purdy could perform substantial gainful work on a sustained and continuing basis."  [#16 at 8].  In response, the Commissioner urges this court to "reject Plaintiff's suggestion that the residual functional capacity finding was vague because the ALJ did not explain what he [sic] meant."  [#17 at 8].  The Commissioner explained that "[t]he ALJ simply meant that plaintiff had other symptoms, but that they could not be considered disability because they did not persist for the requisite period of time, i.e., 12 consecutive months."  [*Id.*].  No Reply brief was filed.

Though not entirely clear, Plaintiff seems to suggest that the ALJ was required to explain the phrase "[w]ith the exception of brief periods of less than 12 continuous months duration." But based on the reasons discussed below, the ALJ appropriately found that no additional limitations were appropriate to include in Mr. Purdy's RFC, concluding that "the most restrictive statements that have been made about the claimant's functioning since the April 9, 2011 alleged onset date are disproportionate with and not supported by the medical and nonmedical evidence in the record."  [#11-8 at 387].  And, to the extent that Mr. Purdy had durations of time that he

could perform in a manner that exceeded his RFC, the ALJ did not ultimately include those vocations, *e.g.*, food clerk orderer, in the occupations that Plaintiff could still perform.  [*Id.* at 389].  Based on the record before it, this court does not find the ALJ's RFC to be too vague to allow this court to determine whether the ALJ applied the appropriate legal standards.

### B.  The Medical Evidence

Plaintiff argues that the medical evidence demonstrates that he began having problems with his hands in 2012, issues that affect his ability to perform even sedentary jobs.  [#16 at 9]. Specifically, despite the objective medical evidence documenting Plaintiff's upper extremity impairments, the ALJ erred when she failed to include "any specific manipulative limitations in assessing [his] RFC."  [*Id.* at 10].  Defendant avers that the objective medical evidence supports the ALJ's RFC determination, as the record evidence does not support a greater limitation on Plaintiff's upper extremities.   See [#17 at 6–8, 12].   The court respectfully agrees with Defendant.

As mentioned, when formulating an RFC assessment, an ALJ must consider the combined effect of all of the claimant's medically determinable impairments, including the severe and non-severe.  *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); 20 C.F.R. § 404.1529(a); SSR 96-9p.  The ALJ's RFC assessment must be consistent with the record as a whole and supported by substantial evidence.  *See generally Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); SSR 96-8p.  Moreover, a claimant's RFC is the most work a claimant can perform, not the least.  20 C.F.R. § 404.1545; SSR 83-10.  However, when reviewing an ALJ's decision, the reviewing court will not "reweigh the evidence or retry the case," *Flaherty*, 515 F.3d at 1070 (internal citation omitted), and will not reverse an ALJ's decision if it is supported

by substantial evidence even if she could have reached a different conclusion, *Ellison*, 929 F.2d at 536.

Here, the ALJ undertook a comprehensive review of the evidence in the record. Regarding Plaintiff's upper extremity impairments, the ALJ noted that Mr. Purdy complained of numbness in his hands and that certain doctors diagnosed him as having left Tennis Elbow. *See* [#11-8 at 378]. The ALJ continued, however, that the objective medical evidence did not support a conclusion that Plaintiff's upper extremity impairments constituted a severe impairment at step two. [*Id.*]. Nonetheless, when assessing Mr. Purdy's RFC, the ALJ considered Plaintiff's complaints of upper extremity impairments, but concluded that the objective medical evidence did not support a greater limitation other than a limit to frequent fine manipulation. *See* [*id.* at 384, 385]. A review of the medical evidence supports the ALJ's conclusion.

The ALJ concluded that, on a number of occasions, the objective evidence indicated that Plaintiff retained normal (or essentially normal) strength and sensation in his upper extremities. [*Id.* at 385]. In reaching this conclusion, the ALJ considered Emergency Department Reports, dated April 8 and 30, 2012, wherein Plaintiff's physical exams revealed normal range of motion in his extremities, no acute distress, and no functional impairments. *See* [#11-7 at 347, 352, 354; #11-8 at 385]. The ALJ considered treatment notes from Dr. Michael F. Hehmann, a neurologist, who on October 15, 2012, reported that Plaintiff had normal strength in his upper extremities and in his hands bilaterally, and that he had "very mild sensory neuropathy" in his left upper extremity. *See* [#11-8 at 385; #11-13 at 678–79]. The ALJ also considered treatment notes from Dr. Douglas Huene, dated January 21, 2014 and July 11, 2014, respectively, which reported Plaintiff's complaints of pain in his hands and diagnosis of left Tennis Elbow, but also

reported that injections in Plaintiff's elbow eased his pain and that his upper extremity strength was a four-out-of-five. *See* [#11-8 at 385; #11-13 at 683–86].

Similarly, the ALJ considered Dr. Matthew Simpson's July 26, 2014 Consultative Exam Report that acknowledged Plaintiff's complaints of bilateral hand pain associated with his diabetic neuropathy, but also reported no discernible discomfort with normal ranges of motion in his shoulders, elbows, wrists, and fingers.  [#11-8 at 385; #11-13 at 698].  Dr. Simpson also reported that Mr. Purdy retained normal strength in his upper and lower extremities.  [#11-13 at 699].  Further, the ALJ specifically considered treatment notes from Pavilion Family Medicine, dated January 2013 to March 2014, which indicated that Plaintiff complained only periodically of worsening hand pains, received intermittent steroid injections for his left Tennis Elbow that alleviated his pain, and that his physical exams were largely normal with only infrequent mention of decreased grip strength.  *See* [#11-8 at 385; #11-13 at 714–734].

Conversely, the objective medical evidence more extensively documents Plaintiff's lower extremity impairments caused by his diabetic neuropathy.  *Compare* [#11-3 (documenting lower extremity impairments and complaints); #11-6 at 199–233 (same); #11-7 at 258–289, 293–313, 329–61 (same); #11-12 at 637–46 (same); #11-13 at 736–37 (same); #11-14 at 739–40, 742–86, 793–824 (same)] *with* [#11-13 at 675–79, 683–86, 694, 702, 708–13, 715–18, 721–23, 731–35 (documenting upper extremity impairments and complaints); #11-14 at 741, 787 (same); #11-15 at 826, 906, 909, 927–28 (same)].  And, although there is evidence that corroborates Mr. Purdy's subjective complaints of worsening hand pain and upper extremity impairments, this evidence does not support his contention that the ALJ failed to adequately consider this medical evidence during her RFC assessment.  As the ALJ explained, Plaintiff's physical examinations largely revealed normal ranges of motion and normal strength, and only intermittently mentioned his

decreased grip strength, despite his complaints of worsening hand pain. *See, e.g.*, [#11-13 at 678 (noting normal strength in upper extremities and bilateral hands), 683–85 (noting complaints of hand pain and decreased grip strength, but reporting 4/5 strength in upper extremities), 698–99 (reporting normal range of motion in upper extremity joints and 5/5 upper extremity strength); #11-14 at 743, 748, 772, 794, 797, 819 (reporting normal range of motion in upper extremities); #11-15 at 877, 884, 891, 896 (reporting that musculoskeletal exam indicated normal muscle strength and tone); #11-16 at 956 (same)].

Ultimately, it was Mr. Purdy's burden to "show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also Cochran v. Colvin*, 619 F. App'x 729, 731–32 (10th Cir. 2015) (rejecting Ms. Cochran's contention that the ALJ committed harmful error by failing to consider her limited hand functionality because the evidentiary record did not support her contentions). The ALJ's second hypothetical to the VE explicitly included a limitation on Plaintiff's bilateral fine manipulation, and the VE testified that Plaintiff could still perform jobs as a charge account clerk or production helper/utility worker. *See Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (holding that an ALJ's hypothetical to the VE to make an RFC assessment "must include all (and only) those impairments borne out by the evidentiary record."). Thus, the court is persuaded that there is sufficient objective medical evidence to support the ALJ's decision. *See Knight ex rel P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014) (holding that the court's review of the ALJ's decision is limited to whether substantial evidence supports that decision).

### C.  The Medical Opinions

Second, Plaintiff asserts that the ALJ's RFC assessment improperly favored the opinions of state agency physicians and consultants over the opinions of Plaintiff's treating sources

regarding his upper extremity impairments.  [#16 at 10].  Specifically, the ALJ improperly relied on the 2011 opinions of non-examining State agency physicians, because Mr. Purdy's upper extremity impairments "manifested after" these examinations.  [*Id.*].  Plaintiff continues that the ALJ also improperly relied on Dr. Simpson's July 2014 opinion—a one-time consultative examination that found no upper extremity limitations.  [*Id.*].  Plaintiff also avers that the ALJ should have considered how Dr. Brethouwer's, Plaintiff's treating physician, 2011 opinion that Plaintiff could not maintain focus or concentration due to his foot and leg pain, would apply to Plaintiff's ability to concentrate given that his diabetic neuropathy had now spread to his hands. [*Id.* at 11].

Defendant argues that no physician, treating or otherwise, ever opined that Plaintiff had greater manipulative limitations than those found by the ALJ; thus, the ALJ did not improperly weigh the medical opinion evidence.  [#17 at 8].  The court respectfully agrees.

In assessing a claimant's RFC, the ALJ must address medical source opinions. Generally, the opinion of a treating source is entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2). *See also* 20 C.F.R. § 404.1527(b), (c); *Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1161 (D. Colo. 2015).  The ALJ is required to apply the following factors when she declines to give the treating source's opinion controlling weight:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing 20 C.F.R. § 416.927(c)(2)(i)-(ii), (c)(3)-(c)(6)). *See also* 20 C.F.R. § 404.1527(c). In all cases, an ALJ must "give good reasons in [the] notice of determination or decision" for the weight assigned to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). *See also Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing SSR 96–2p, 1996 WL 374188, at *5; *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003)). "[I]f the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so." *Watkins*, 350 F.3d at 1300 (internal quotations and citations omitted).

Here, the ALJ gave little weight to the opinions of Dr. Brethouwer, Plaintiff's treating physician. *See* [#11-8 at 386–87]. Instead, the ALJ placed significant weight on the opinion of Dr. Simpson who performed a consultative examination of the Plaintiff on July 26, 2014. [*Id.*]. Notably, however, both of Dr. Brethouwer's opinions in 2011 and 2014 focused solely on Plaintiff's diabetic neuropathy in his legs and feet. *See* [*id.* (discrediting Dr. Brethouwer's opinions that Plaintiff's leg and foot pain would disrupt his concentration and focus, would limit him to standing for only ten minutes and sitting for less than four hours daily, and that Plaintiff would need to elevate his legs to thigh height eighty-percent of the day, because these opinions were based primarily on Plaintiff's own subjective complaints); #11-7 at 305–12 (Dr. Brethouwer's 2011 RFC Questionnaire discussing Plaintiff's lower extremity impairments); #11-13 at 737 (Dr. Brethouwer's 2014 opinion discussing Plaintiff's lower extremity limitations)]. *See Also Oldham v. Astrue*, 509 F.3d 1254, 1259 (10th Cir. 2007) (holding that an ALJ's conclusion that a medical opinion is based primarily on the claimant's unreliable subjective complaints is a legitimate reason for discounting that medical opinion). Neither Dr. Brethouwer, nor any examining sources, have opined to any limitations in Plaintiff's upper extremities. In

fact, Dr. Brethouwer's 2011 opinion stated that there were no significant limitations in doing repetitive reaching, handling, or fingering, and that Plaintiff "has good upper extremity strength" and could lift fifty pounds occasionally.  [#11-7 at 309, 311].  Dr. Brethouwer's 2014 opinion similarly placed no restrictions on Plaintiff's upper extremities, and indicated that Plaintiff could lift ten or more pounds on a frequent basis.  [#11-13 at 737].

Nevertheless, Plaintiff argues that the ALJ impermissibly discredited Dr. Brethouwer's opinions, based on the ALJ's own credibility judgments and speculation.  [#16 at 11].  According to Plaintiff, because Dr. Brethouwer opined that Plaintiff's diabetic neuropathy in his legs and feet would interfere with his ability to concentrate and focus, the ALJ was required to consider how this opinion might apply to the fact that Plaintiff's diabetic neuropathy is spreading to his hands.  [*Id.*].  The ALJ's failure to do so was an "impermissibl[e] substitut[ion] [of] her judgment for that of Mr. Purdy's treating sources regarding the validity of his subjectively reported pain" in his upper extremities.  [*Id.* at 11–12].

Certainly, an ALJ may not substitute her judgment for that of a medical source, based on the ALJ's conclusion that Plaintiff's complaints are not credible.  *See e.g.*, *Williams v. Colvin*, No. 13-CV-1423-MSK, 2015 WL 4237593, at *10 (D. Colo. July 14, 2015) (collecting cases) (quoting *Valdez v. Barnhart*, 62 F. App'x 838, 842 (10th Cir. 2003)).  Here, however, the ALJ did not reject a medical source's opinion regarding Plaintiff's upper extremity impairments, as no source, treating or otherwise, reported any such limitations.  Nor did the ALJ discount Dr. Brethouwer's opinions because of her own speculation or lay opinion.  *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotations and citation omitted).  Rather, the ALJ formulated Plaintiff's RFC based on the medical record, and, as discussed above, the medical evidence supports the fine manipulation restriction imposed by the ALJ.  *See Chapo v.*

*Asture*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." (internal quotations and citations omitted)).

### D.  Plaintiff's Daily Activities and Credibility

Third, and finally, Plaintiff argues that substantial evidence does not support the ALJ's RFC assessment because the ALJ mischaracterized the quality of his daily activities.  [#16 at 13]. Plaintiff contends that his daily activities "are much more nuanced" than the ALJ's summary suggests, because he testified that he can no longer shave, that his significant-other and her son do most of the household chores, that he must rest in a recliner for most of the day, and that he cannot hold tools for more than fifteen to twenty minutes.  [*Id.*].  Defendant responds that the ALJ properly considered Plaintiff's daily activities throughout the entire period of claimed disability, *i.e.*, April 9, 2011 to December 31, 2014.  [#17 at 11].  Further, Defendant avers that Plaintiff focuses solely on his testimony regarding his daily activities at the time of the second hearing on September 16, 2015, which is not representative of his described daily activities. [*Id.*].  For the following reasons, the court concludes that, to the extent the ALJ mischaracterized Plaintiff's daily activities in rendering her credibility determination,[9] such mischaracterization was harmless as substantial evidence supports her RFC assessment.  *Cf. Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (approving harmless-error analysis when "based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable

---

[9] On March 28, 2016, SSR 16-3p took effect and superseded SSR 96-7p, "eliminating the use of the term 'credibility.'"  *See* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS, *available at* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html. Because the ALJ issued her decision in November 2015, the court analyzes her credibility determination under SSR 96-7p.

administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.").

"'Credibility determinations are peculiarly the province of the finder of fact' and the Tenth Circuit will uphold such determinations, so long as they are supported by substantial evidence." *Ruh v. Colvin*, No. 13-CV-01255-PAB, 2015 WL 1517392, at *2 (D. Colo. Mar. 30, 2015) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). "Credibility determinations should not be conclusory, but instead 'closely and affirmatively linked' to evidence in the record." *Oliva v. Colvin*, No. 13-CV-02495-PAB, 2015 WL 5719645, at *7 (D. Colo. Sept. 30, 2015) (quoting *Kepler*, 68 F.3d at 391)). In addition to considering the objective medical evidence, the ALJ must also consider several factors including, *inter alia*, the claimant's daily activities. *See* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *accord Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010). However, the ability to perform daily activities on a sporadic basis does not equate to the claimant being able to engage in substantial gainful activity; nor may an ALJ rely on minimal daily activities to find that the claimant does not suffer from disabling pain. *Proctor v. Astrue*, 665 F. Supp. 2d 1243, 1256 (D. Colo. 2009).

Here, the ALJ found Plaintiff's allegations regarding his disabling pain not entirely credible, because the objective medical and non-medical evidence did not substantiate his allegations. [#11-8 at 384]. In doing so, the ALJ considered the objective medical evidence, the lack of any alleged or reported side effects from his medication, Plaintiff's daily activities, as well as the medical source opinions. *See* [*id.* at 384–87]. As to Plaintiff's daily activities, the ALJ concluded that Plaintiff "has been able to carry out most activities of daily living since April 9, 2011 [alleged onset date] including taking care of his personal needs independently, caring for the needs of his minor daughter [including taking her to the park], cooking, performing light

housework and yard work, managing money, and driving." [*Id.* at 385]. In addition, the ALJ found that Plaintiff could shop and socialize with others. [*Id.*].

In reaching this conclusion, the ALJ considered Plaintiff's July 18, 2011 Function Report, his June 6, 2014 Function Report and Fatigue Report, his August 24, 2011 Consultative Psychology Exam, and his testimony at the September 16, 2015 hearing. [*Id.*]. A review of this evidence reveals that Plaintiff cares for his minor daughter, changing and feeding her, as well as playing with her periodically; that he drives, but tries to avoid it if possible because of his foot pain; that his ex-wife and older children, and now his significant-other and her son, do most of the house and yard work; that he has some problems with personal care, *e.g.*, holding the razor and standing in the shower; that he prepares meals for his daughter, but does not cook as often as he used to; that he shops less frequently due to his lower extremity pain; that he no longer pays the bills; that he socializes with others three to four times a week; and that he can no longer ride dirt bikes, fish, camp, or help change the brakes on a friend's car. *See* [#11-6 at 221–25; #11-7 at 284; #11-8 at 409–10, 411–15, 418–20, 429; #11-12 at 621–27, 629]. Based on the foregoing, the court respectfully agrees with Plaintiff that his daily activities are "much more nuanced" than the ALJ suggests. *See* [#16 at 13]; *accord Richardson v. Astrue*, 858 F. Supp. 2d 1162, 1179 (D. Colo. 2012) ("[L]imited activities in themselves do not establish that one can engage in light or sedentary work." (quoting *Talbot v. Heckler*, 814 F.2d 1456, 1462–63 (10th Cir. 1987)).

However, the court does not conclude, as Plaintiff suggests, that the ALJ's mischaracterization of Plaintiff's daily activities constitutes reversible error. *But cf. Sitsler v. Astrue*, 410 F. App'x 112, 117 (10th Cir. 2011) ("We have criticized this form of selective and misleading evidentiary review, holding that an ALJ cannot use mischaracterizations of a claimant's activities to discredit his claims of disabling limitations."). As mentioned, the ALJ

considered Plaintiff's daily activities as one of several factors in determining his RFC and credibility.  Notably, the ALJ focused largely on the objective medical evidence—evidence that supports the ALJ's RFC assessment and credibility determination.  *See Hardman v. Barnhart*, 362 F.3d 676, 678–79 (10th Cir. 2004) (noting that an ALJ's credibility finding should be closely and affirmatively linked to substantial evidence in the record).  Moreover, "so long as the ALJ sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility, [s]he need not make a formalistic factor-by-factor recitation of the evidence. . . . [C]ommon sense, not technical perfection, is [the court's] guide." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012) (internal quotations and citations omitted).  Therefore, the court concludes that any error in mischaracterizing Plaintiff's daily activities is harmless, as substantial evidence supports the ALJ's RFC assessment and credibility determination.  *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (upholding the ALJ's credibility determination because it was linked to substantial evidence; noting "[o]ur precedents do not require more").

**III.    Step Five**

Mr. Purdy also challenges the ALJ's decision at step five of the sequential analysis. Specifically, he alleges that the ALJ erred when she concluded that Plaintiff could perform the two sedentary jobs identified in the national economy, because his RFC required greater upper extremity limitations.  [#16 at 14].  For the same reasons discussed above and those below, the court finds this argument unpersuasive.

At step five of the sequential analysis, "the burden of proof shifts to the Commissioner [] to show that the claimant retains sufficient RFC to perform work in the national economy, given her age, education, and work experience." *Hackett*, 395 F.3d at 1171; 20 C.F.R. § 404.1520(a)(4)(v).  This also requires the ALJ to consider any exertional and nonexertional

limitations that may impede the claimant's ability to perform the identified work.[10]  SSR 83-14.

The ALJ identified two sedentary jobs that Plaintiff could perform, *e.g.*, charge account clerk and

production helper/utility worker.  *See* [#11-8 at 389].  Typically, sedentary jobs "require good

use of the hands and fingers for repetitive hand-finger actions."  SSR 83-10; *see also* SSR 96-9p

(explaining that sedentary work involves "nonexertional" activities such as manipulation).

Plaintiff challenges the ALJ's findings on the basis that the ALJ did not properly consider

how he could perform these two jobs given his upper extremity limitations.  [#16 at 14].

Specifically, each job requires frequent reaching and handling, and occasional fingering, which

Mr. Purdy cannot perform.  [*Id.*].  However, as discussed *supra*, substantial evidence supports

the ALJ's RFC assessment.

At the September 16, 2015 hearing, the ALJ posited a hypothetical question to the VE

that included a limitation of frequent fine manipulation with Plaintiff's bilateral hands, to which

the VE responded that such an individual could perform jobs as a charge account clerk and

production helper/utility worker.  *See* [#11-8 at 436–37]; *see also Evans*, 55 F.3d at 532 (holding

that vocational inquiries when making an RFC assessment "must include all (and only) those

impairments borne out by the evidentiary record").  ALJs are not required to "exhaust every

possible line of inquiry in an attempt to pursue every potential line of questioning.  The standard

is one of reasonable good judgment."  *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir.1997).

Further, an ALJ is generally entitled to "rely on the claimant's counsel to structure and present

claimant's case in a way that the claimant's claims are adequately explored."  *Branum v.

Barnhart*, 385 F.3d 1268, 1271 (10th Cir.2004).  At the hearing, Ms. Ryan added only one

---

[10]  "[E]xertional limitations [standing, walking, sitting, lifting, carrying, pushing, and pulling] affect an individual's ability to meet the strength demands of jobs, and nonexertional limitations or restrictions affect an individual's ability to meet the nonstrength demands of jobs." SSR 96-4p.

variation to the ALJ's hypothetical:  would the claimant be able to work any of the two jobs identified if that individual had to elevate his legs to thigh height for eighty-percent of the day? [#11-8 at 38].  Indeed, Ms. Ryan made no inquiry into whether Plaintiff could perform these jobs given his alleged need for greater upper extremity limitations other than those identified by the ALJ.  *Cf. Howard*, 379 F.3d at 949 (holding that there is no requirement that there must be "specific, affirmative, medical evidence on the record as to each requirement" of sedentary work "before an ALJ can determine RFC within that category.").  For these reasons, substantial evidence supported the ALJ's conclusion at step five.  *See Ellison,* 929 F.2d at 536.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.


DATED:  March 6, 2017                              BY THE COURT:

                                                  s/Nina Y. Wang_____
                                                  Nina Y. Wang
                                                  United States Magistrate Judge